UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.  Case No. 8:09-cr-107-T-24-EAJ

CHARLES L. HUTCHINSON and
FRANKLYN M. KRIEGER,

_____/

**ORDER**

This cause comes before the Court on Defendant Charles L. Hutchinson's Motion to Sever (Dkt. 373) and Motion in Limine (Dkt. 374). The Government opposes both Motions. (Dkt. 379, 380.) Defendant Franklyn M. Krieger filed responses to both motions. (Dkt. 378, 382.) For the reasons set forth below, the Court DENIES the Motion to Sever and GRANTS in part and DENIES in part the Motion in Limine.

**I. BACKGROUND**

**A. Introduction**

On March 3, 2009, the District of South Carolina transferred Hutchinson, one of several defendants in a larger conspiracy action, to this Court. (Dkt. 241.) Thereafter, the South Carolina court and those parties still before it addressed the admissibility of certain evidence –

the "Krieger recordings"[1] and the "Dryja evidence."[2] The Government argued that the Krieger recordings consisted of co-conspirator statements admissible against all of the defendants, but Krieger's co-defendants maintained that the evidence was inadmissible against them and that its introduction in a joint trial would violate Crawford v. Washington, 541 U.S. 36 (2004), and Bruton v. United States, 391 U.S. 123 (1968).

The South Carolina court rejected the Government's argument that the Krieger recordings contained co-conspirator statements. (Dkt. 277.) Attempts to redact the transcripts so that they could be admitted at a joint trial were unsuccessful because the Government's efforts to make the statements comply with Bruton conflicted with Krieger's interests in presenting a strong defense to the jury. (Dkt. 304, 8/04/09 Hr'g Tr. at 325-26.) Certain statements that incriminated Krieger's co-defendants, his attorney argued, exonerated Krieger. (Dkt. 296.) When the Government opted to forgo introducing the Krieger recordings and Dryja evidence in the South Carolina case in the interest of maintaining a joint trial, Krieger and the remaining co-defendants moved for Krieger's severance. (Dkt. 308.) Krieger's attorney represented to the South Carolina court that "there [was] no legal reason . . . why [Krieger] couldn't be combined with Hutchinson [in a Florida trial]" and that "it would probably add a week to trial time." (Dkt. 329, 10/5/09 Hr'g Tr. at 14-15.) Because Hutchinson was no longer before the South Carolina court, he was not represented at this hearing. The South Carolina court severed Krieger and

---

[1]The Krieger recordings consist of a series of conversations between Krieger and Bobby Davids, the former Vice President of Mergers and Acquisitions for Medical Manager, made after Davids began cooperating with the Government. They total nearly six hours of tape.

[2]Portions of the Krieger recordings constitute Dryja evidence, which will be described more fully below.

transferred him to this Court on December 22, 2009. (Dkt. 364.)

Hutchinson has now moved for severance from Krieger and, in the alternative, for the Dryja evidence (including much of the Krieger recordings) to be excluded. (Dkt. 373, 374.) The Government opposes both motions. (Dkt. 379, 380.) Krieger opposes severance but agrees that the Government should be precluded from introducing the Krieger recordings. (Dkt. 378, 382.)

**B. Facts**

Hutchinson, Krieger, and their former co-defendants were employees of Medical Manager from the 1990s through the early-2000s. Following Medical Manager's IPO in 1997, the company began acquiring independent dealers; Bobby Davids negotiated these acquisitions. One acquired dealer was Richard Dryja's company, Computers for Medicine, and information related to this acquisition comprises the Dryja evidence.

Through a series of mergers, Medical Manager ultimately became part of WebMD Corporation ("WebMD") in 2000. Accounting irregularities in Medical Manager's books were discovered after an interim merger in July 1999, and by 2002, WebMD had launched an internal investigation into the company's acquisition practices.

On February 27, 2007, the Government indicted several Medical Manager executives for Conspiracy to Defraud the United States, Conspiracy to Launder Money, and Money Laundering.[3] (Dkt. 71.) According to the indictment, the defendants manipulated Medical Manager's revenue and earnings to inflate the market price of its stock fraudulently, made

---

[3] Only one Medical Manager executive – John Sessions – was indicted for Money Laundering (Dkt. 71), and the Government has since dismissed without prejudice the Money Laundering Conspiracy count as to both Krieger and Hutchinson. (Dkt. 301, 314.)

3

Medical Manager an artificially attractive acquisition target, used the fraudulently inflated price of its stock to facilitate the acquisition of target companies, and concealed this fraud.

C. **Dryja Evidence**

Medical Manager acquired Dryja's company, Computers for Medicine, in 1997. Medical Manager continued to employ Dryja, but less than two years after the acquisition of his company, Dryja was terminated for cause. Dryja then sued for wrongful termination. In a 1999 deposition given in his civil case, Dryja testified that following the sale of his company to Medical Manager, a third party inquired about purchasing a software package Computers for Medicine had created.

Dryja asked Davids who owned the intellectual property rights to the software, and Davids responded that in exchange for a personal check for nearly $6,000, he would give Dryja a document showing the intellectual property rights had been excluded from the sale of Computers for Medicine.

Krieger learned of Dryja's testimony, requested a copy of the check, asked the counsel of record in the wrongful termination action about Dryja's claims, and subpoenaed the bank for a copy of the check. Krieger then took copies of the check and Dryja's deposition testimony to John Sessions and Michael Singer, two Medical Manager executives. Singer allegedly urged Sessions and Krieger not to discuss this information with Davids or with WebMD's executives. But in 2003, Krieger contacted Michael Glick, then-in-house counsel for WebMD, about his findings. Following that conversation, and at Glick's instruction, Krieger prepared a memo recounting the affair and sent the memo to Glick.

Along with the Glick memo (which the Government maintains it will not introduce at

trial (Dkt. 380)), sources of Dryja evidence could include (1) in-court testimony of Glick; (2) in-court testimony of outside counsel to WebMD during relevant periods; and (3) recordings of conversations between Davids and Krieger (the "Krieger recordings") made after Davids began working for the Government in its investigation of Medical Manager's alleged conspiracy.

At the Government's request, Davids contacted Krieger under the guise of seeking advice from Krieger on how to threaten Singer and Sessions with disclosure in order to obtain his full severance package. During these conversations, Davids tried to elicit inculpatory statements about Medical Manager's accounting practices, and Krieger spoke at length about the Dryja incident and what was known about the payment Davids received from Dryja. The Krieger recordings, therefore, include both Dryja evidence and evidence unrelated to Dryja but which is still probative of Medical Manager's allegedly nefarious activities.

All parties agree that Hutchinson was in no way involved in the Dryja incident. He did not know about Davids' interaction with Dryja, nor was he privy to the conversations about the acquisition that followed. As such, Hutchinson is rarely mentioned in this body of evidence; those instances in which Hutchinson is mentioned concern matters unrelated to Dryja.

## II. DISCUSSION

Hutchinson asserts essentially the same arguments in both of his Motions: the Krieger recordings and Dryja evidence are irrelevant to the charges against him, and their admission at a joint trial would violate his constitutional rights under Crawford and Bruton. Therefore, Hutchinson argues, either the evidence must be excluded or he and Krieger must be tried separately.

5

**A. The Dryja Evidence Is Relevant to the Charges Against Hutchinson**

Hutchinson argues that because there are no allegations that he participated in or knew of the Dryja incident, all Dryja evidence is irrelevant and inadmissible against him. He also presents what amounts to a guilt-by-association argument that the jury would be more likely to find him guilty of conspiracy if the jury were to assume that he was involved in the Dryja incident.

The Government argues that the Dryja evidence is relevant and admissible against both Krieger and Hutchinson because it reveals an aspect of the conspiracy to conceal information from WebMD. Under the Government's theory, Krieger, Singer, and Sessions conspired to conceal the Dryja affair because they feared discovery of this relatively minor incident would reveal larger corporate misdeeds. Because Hutchinson was allegedly part of that larger conspiracy, the Government argues, evidence of this related scheme is admissible against him.

An individual can be held responsible as a co-conspirator without knowledge of all the members or details of the conspiracy. See United States v. Hansen, 262 F.3d 1217, 1247 (11th Cir. 2001) ("It is unnecessary . . . that each conspirator participated in all aspects of a conspiracy, knew each phase or every detail of the conspiracy, or knew all of the participants.") (citing United States v. Pedrick, 181 F.3d 1264, 1272 (11th Cir. 1999)); United States v. Knowles, 66 F.3d 1146, 1159 (11th Cir. 1995) (quoting United States v. Reed, 980 F.2d 1568, 1582 (11th Cir. 1993)).

Because the Government has alleged that the Dryja incident was an aspect of the larger conspiracy to conceal accounting improprieties from WebMD, the Dryja evidence is relevant to the charges against Hutchinson. This is true even though Hutchinson had no personal knowledge of or

involvement in the incident. As such, absent other grounds for exclusion, the Dryja evidence is relevant and admissible against Hutchinson.

**B. The Krieger Recordings Are Hearsay and Inadmissible Against Hutchinson**

Hutchinson contends that the Krieger Recordings include statements that, if admitted, would violate his constitutional rights under Crawford and Bruton. The Government responds that all statements contained in the Krieger Recordings are co-conspirator statements and are, therefore, non-hearsay and admissible against both Krieger and Hutchinson. The Court finds that though the Krieger Recordings were made within the time frame that the alleged conspiracy was active, the statements therein were not made in furtherance of the conspiracy and thus are inadmissible hearsay as to Hutchinson.

1. *The Krieger Recordings Do Not Implicate Crawford*

As an initial matter, the statements included in the Krieger Recordings are not testimonial; therefore they do not implicate Crawford. The Sixth Amendment guarantees criminal defendants the right to confront the witnesses against them, so to offer testimonial evidence at trial, the Confrontation Clause requires that the declarant be unavailable at trial and that the defendant have a prior opportunity to cross-examine. See Crawford, 541 U.S. at 68. The Crawford Court did not define "testimonial evidence," but it did indicate that statements are testimonial in nature if they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52. Analysis focuses on "the declarant's awareness or expectation that his or her statements may later be used at a trial." United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004). Framed differently, the focus is on the declarant's intent:

7

"[t]he proper inquiry, then, is whether the declarant intends to bear testimony against the accused." United States v. Cromer, 389 F.3d 662, 675 (6th Cir. 2004).

Crawford characterized statements in furtherance of a conspiracy and statements "unwittingly" made to confidential informants as intrinsically non-testimonial. 541 U.S. at 56, 58. Where a declarant makes statements to a government agent whose true status is unknown – i.e., where circumstances suggest a voluntary and knowing conversation would not happen – the statements are not testimonial, and therefore Crawford is not implicated. See United States v. Underwood, 446 F.3d 1340, 1347 (11th Cir. 2006).

Hutchinson argues that during his conversations with Davids, Krieger knew – or at least suspected – that he was being recorded, and therefore his statements were testimonial in nature and fall within the purview of the Confrontation Clause. However, for a statement to be testimonial under Crawford, the declarant must intend or reasonably expect his statements to be used *against the accused*. See Cromer, 389 F.3d at 675 (emphasis added). Nothing indicates that Krieger intended or anticipated that his statements would be used at trial against Hutchinson. Moreover, the inculpatory nature of the statements included in the Krieger recordings belies the suggestion that Krieger spoke knowing he was being recorded. Rather, the conversations with Davids indicate that Krieger was primarily concerned about his own involvement in the Medical Manager mess.

*2. The Krieger Recordings Are Not Co-Conspirator Statements*

The Government argues that the Krieger recordings are a series of co-conspirator statements and are therefore admissible against Hutchinson, but this argument is unpersuasive. To characterize a statement as a co-conspirator statement, the party seeking admission must prove each of three things by a preponderance of the evidence: (1) a conspiracy existed; (2) the conspiracy included the

8

declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy. United States v. Flores, 572 F.3d 1254, 1264 (11th Cir. 2009) (citing United States v. Hasner, 340 F.3d 1261, 1274 (11th Cir. 2003)). In its admissibility evaluation, the court may consider the statement itself as well as extrinsic evidence. Id. The Eleventh Circuit applies a liberal standard in determining whether a statement is in furtherance of a conspiracy. Id. To qualify, the statement need not be necessary to the conspiracy; it needs only to somehow further the interests of the conspiracy. Id. Statements that reassure, foster trust and cohesiveness, or apprise a co-conspirator of the status of the conspiracy are sufficient. United States v. Siegelman, 561 F.3d 1215, 1236 (11th Cir. 2009) (quoting United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983)).

The indictment alleges information sufficient to establish prongs (1) and (2) above. (Dkt. 71.) And the timing element of prong (3) appears to be satisfied. The recordings were made in 2003, and the indictment alleges that the conspiracy began "in or about February 1997, and continu[ed] through at least 2003." (Dkt. 71.) Notably, the South Carolina jury that convicted two of the original co-conspirators found that overt acts of the conspiracy were committed around July and August of 2003. (D.S.C. Dkt. 990, 992, 997 pp. 12-13.) But whether the statements were made in furtherance of the conspiracy is a more complicated question. As discussed above, Davids approached Krieger under the guise of threatening his alleged co-conspirators with disclosure of all their corporate misdeeds in an effort to secure his full severance package. For example, in their first recorded conversation, Davids explains to Krieger that when Davids left Medical Manager he refused to certify that he was unaware of any corporate improprieties and that his refusal jeopardized his severance. Davids then told Krieger that he

intended to meet with Singer and Sessions about the severance and asked Krieger, "which of the accounting frauds do you think I could bring up to them that would [get their attention]?" (Dkt. 296, Ex. A p. 15.) Davids' claimed purpose was to go to Singer and Sessions, threaten them with disclosure of a few key accounting improprieties, and walk away with his full severance.

If concealment is a primary purpose of the conspiracy, discussions about threats of disclosure would not be in furtherance of the conspiracy. Quite the contrary, such discussions would seem to undermine the objective of concealment. Because the conversations between Davids and Krieger captured in these tapes relate to potential disclosure (or at least threats of disclosure) that would undermine the conspiracy's purpose of concealment, the statements could not have been made in furtherance of that conspiracy. As such, the statements contained in the Krieger recordings cannot be characterized as co-conspirator statements. Instead, they are inadmissible hearsay as applied to Hutchinson. However, the Krieger recordings are admissible as admissions under Federal Rule of Evidence 801(d)(2) as to Krieger.

## C. Bruton Concerns Can Be Resolved with Redaction, Cautionary Instructions, or Exclusion

Admission of a non-testifying defendant's confession[4] that inculpates his co-defendant violates that co-defendant's Sixth Amendment right to cross-examine the witnesses against him. See Bruton, 391 U.S. 123, 126 (1968). The Bruton Court based its holding on the risk (or indeed

---

[4]The Government argues that Bruton applies only to confessions, so the doctrine is inapplicable here. That argument fails. The Eleventh Circuit has held that Bruton applies to statements as well as confessions. See, e.g., United States v. Avery, 760 F.2d 1219, 1223 n. 7 (11th Cir. 1985) ("Bruton is not limited to confessions. The self-incriminatory nature of the statement is immaterial. It is the fact that it incriminates a defendant other than the non-testifying declarant that abridges the co-defendant's constitutional rights of confrontation.").

likelihood) of a jury being unable to follow limiting instructions when "powerfully incriminating extrajudicial statements of a codefendant . . . are deliberately spread before the jury in a joint trial." Id. at 135-36. "[P]owerfully incriminating" statements are those that directly implicate the defendant. United States v. Turner, 474 F.3d 1265, 1277 (11th Cir. 2007) (quoting United States v. Beale, 921 F.2d 1412, 1425 (11th Cir. 1991)).

The Supreme Court further developed the Bruton doctrine in Richardson v. Marsh, when it explained that Bruton contemplated statements that were "facially incriminating" or that "expressly implicated" the co-defendant. 481 U.S. 200, 207-08 (1987). To pass Bruton muster, the confession must be "redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211. Later, in Gray v. Maryland, the Court explained that blatant redactions (those that substitute an obvious blank, the word "delete," or a symbol for a proper name) essentially notify the jury of the edit and therefore violate Bruton. 523 U.S. 185, 195 (1998).

The Supreme Court has not decided whether replacing a defendant's name with a neutral pronoun violates Bruton, Richardson, 481 U.S. at 211 n. 5, but the Eleventh Circuit has a body of caselaw addressing that situation. In United States v. Satterfield, the Eleventh Circuit interpreted Bruton and its progeny relatively narrowly, holding that for Bruton to be applicable, "a co-defendant's statement must be clearly inculpatory standing alone." 743 F.2d 827, 849 (11th Cir. 1984). But since deciding Satterfield in 1984, the Eleventh Circuit has broadened its approach and has evaluated co-conspirator statements in conjunction with the body of evidence presented at trial. See, e.g., United States v. Mendoza-Cecelia, 963 F.2d 1467, 1481 (11th Cir. 1992) ("If a confession so redacted describes a codefendant's participation in the crime, it remains clearly inculpatory if the jury would logically conclude from the other evidence in the record that the neutral pronoun or

general word indeed represented the codefendant."); United States v. Petit, 841 F.2d 1546, 1556 (11th Cir. 1988) (finding a Bruton violation where the word *friend* "could reasonably be understood only as referring to [the defendant]" when considered with other evidence); United States v. Bennett, 848 F.2d 1134, 1142 (11th Cir. 1988) (holding the co-defendant's statement "clearly implicated" the appellant-defendants where "the pronoun 'they' could most logically be understood to refer to [the appellant-defendants]. . . . especially [ ] in light of the prosecutor's opening statement and closing argument").

Hutchinson cites several passages from the Krieger recordings – one of which explicitly names Hutchinson among other co-defendants, and others that refer to "everybody" at Medical Manager – and claims that the recordings violate Bruton and therefore necessitate severance. These are hearsay statements, and presuming the declarant, Krieger, does not testify at trial, they would implicate Bruton. As such, the statements will need to be redacted to remove any reference to Hutchinson in order to be admitted at trial against Krieger. The Court makes no rulings at this time as to whether this evidence will ultimately be admissible at trial, but it does note its concern about the feasibility of redaction, especially given Eleventh Circuit precedent finding Bruton violations where evidence at trial would lead a jury to the reasonable and logical conclusion that the neutral pronouns incorporated into the co-defendant's statement represent or include the defendant.

Hutchinson also argues that the jury could confuse the issues and assume, based on Krieger's statements, that "Medical Manager was a place full of people with reckless disregard for the law." (Dkt. 374 at 14.) The Court finds this argument without merit. Because the Dryja incident was, the Government contends, a smaller scheme of concealment within the larger conspiracy, the evidence has probative value with respect to Hutchinson. Moreover, any risk of

12

undue prejudice could be cured by a limiting instruction at trial. Regardless, Bruton does not mandate severance here. If the Court finds a combination of redaction and cautionary instructions are insufficient to cure any undue prejudice to Hutchinson, the Government will be prohibited from admitting the transcripts at trial.

**D. Hutchinson and Krieger May Be Tried Together**

Joint trials are preferred for defendants indicted together. Zafiro v. United States, 506 U.S. 534, 537 (1993). Joint trials preserve judicial resources, promote efficiency, and facilitate equitable and consistent verdicts. Id. With those considerations in mind, a district court must "balance the prejudice that a defendant may suffer from a joint trial, against the public's interest in judicial economy and efficiency." Knowles, 66 F.3d at 1158 (citing United States v. Cross, 928 F.2d 1030, 1037 (11th Cir. 1991)). Severance is appropriate only if a joint trial would present a serious risk of "compromis[ing] a specific trial right of one of the defendants, or prevent[ing] the jury from making a reliable judgment about guilt or innocence." Id. at 539. Defenses that are mutually antagonistic "to the point of being mutually exclusive" compel severance, Knowles, 66 F.3d at 1159, but this is a difficult threshold to meet. Mutual antagonism requires that in order for the jury to believe evidence offered on behalf of one defendant, it must disbelieve evidence offered on behalf of his co-defendant. Id.

A court will not find the risk of "compelling prejudice sufficient to mandate a severance simply because much of the evidence at trial is applicable only to co-defendants." Id. (quoting United States v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990)). District courts have discretion to "tailor[] the relief to be granted, if any," and frequently limiting instructions are sufficient "to cure any risk of prejudice." Zafiro, 506 U.S. at 538-39. In fact, "[s]everance is justified as a

remedy only if the prejudice flowing from a joint trial is clearly beyond the curative powers of such instructions." United States v. Baker, 432 F.3d 1189,1237 (11th Cir. 2005) (citing United States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985)).

Severance is unnecessary here. Nothing indicates that Hutchinson and Krieger will present mutually antagonistic defenses. Both defendants will presumably contend that there was no such conspiracy, and if there were, that they were not participants. There is no reason to think that the jury would be forced to believe either one defendant or the other, but not both. As for the evidentiary issues, the Krieger recordings are admissible against Krieger as admissions and inadmissible hearsay as to Hutchinson; whether redaction is sufficient to allow the recordings to come in at a joint trial remains to be seen. Otherwise – and subject to evidentiary rulings at the time of trial – the other Dryja evidence is relevant and admissible against Hutchinson as well as Krieger. The Court anticipates that any remaining potential for prejudice may be remedied with appropriate cautionary instructions at trial. Moreover, a joint trial appropriately advances the interests of judicial economy and convenience for witnesses without compromising the rights of either defendant.

### III.  CONCLUSION

Accordingly, it is ORDERED AND ADJUDGED that Defendant Hutchinson's Motion for Severance is **DENIED**, and Defendant Hutchinson's Motion in Limine is **GRANTED in part** and **DENIED in part**.

The Motion in Limine is **GRANTED** as to the Krieger recordings. Because the Krieger recordings are inadmissible hearsay as to Hutchinson, the transcripts and recordings must be redacted in compliance with Bruton if they are to be admitted as to Krieger.

The Motion in Limine is **DENIED** as to the Dryja evidence.

This case is set for a status conference on May 19, 2010 at 9:00 A.M. and for trial beginning August 2, 2010. At the status conference the Court will set deadlines for filing pretrial motions and responses.

**DONE AND ORDERED** at Tampa, Florida, this 13th day of April, 2010.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record